The Full Commission has reviewed the prior Opinion and Award based upon the record of the prior proceedings and the briefs before the Full Commission. Both parties waived oral argument before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence or to amend the Opinion and Award.
* * * * * * * * * * *
An Interlocutory Opinion and Award by Commissioner Ballance was filed on 31 October 1994 and which found that plaintiff had contracted a compensable occupational disease which reserved the issue of the amount of compensation plaintiff was entitled to for subsequent determination after receipt of additional evidence. The record was reopened and the parties were directed to submit stipulated evidence on plaintiff's period of temporary total disability and any credits claimed by defendants. When Commissioner Ballance filed the 23 May 1995 Opinion and Award the prior Interlocutory Opinion and Award was rescinded.
* * * * * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At all times relevant to this claim, the employer-employee relationship existed between the plaintiff and defendant-employer.
3. At all times relevant to this claim, the employer was self-insured and American International Adjustment Company was the servicing agency.
4. Plaintiff's average weekly wage at the time this claim arose was $520.00 per week.
5. Plaintiff is alleging that she became disabled as a result of an occupational disease arising out of and in the course of her employment on 15 May, 1991.
* * * * * * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. At the time of hearing, plaintiff was 51 years old and had completed high-school.
2. Plaintiff worked at the P.H. Glatfelter, Ecusta Division from 23 February 1974 through 18 December 1992, a period of 19 years. Plaintiff worked in the tipping department for approximately 13 years and as a slitter operator for approximately four years. Defendant-employer manufactures paper which is used in cigarette production.
3. As a slitter operator, plaintiff's job duties involved operating a machine which slits large rolls of paper into smaller rolls for use in making cigarettes. The slitting process created a large amount of visible paper dust particles in the air around the machine which plaintiff inhaled regularly.
4. On 15 May 1991, plaintiff had an episode of shortness of breath, rapid heartbeat, chest pain, and lesions on her leg which caused her to seek emergency medical treatment. Plaintiff underwent a series of pulmonary tests. Dr. Donald Russell, a specialist in the areas of internal medicine and respiratory allergies, who evaluated plaintiff as a result of a referral from Dr. Charles Lefler, initially diagnosed asthma by spirometry, probable allergic rhinitis, possible hypersensitivity vasculitis on the leg, superimposed on stasis dermatitis.
5. Prior to the May, 1991 episode of shortness of breath and rapid heartbeat, plaintiff had been treated periodically by Dr. Donald John Godehn, a dermatologist, for recurrent ulcerations on the leg. Dr. Godehn initially treated plaintiff on 24 July 1987 and diagnosed her condition a stasis ulcer. After a brief period of treatment the condition cleared and plaintiff did not return for further treatment until 17 November 1989. At said time, plaintiff's ulcerations were significantly different from her 1987 condition. She had several large tender inflammatory nodules on the left leg which were indicative of a type of inflammatory vasculitis known as erythema nodosum and caused by an allergic reaction.
6. In searching for the cause of plaintiff's allergic reaction in 1990, Dr. Godehn ruled out through testing and evaluation the likely physiological causes. He then studied plaintiff's history and learned that she worked at the tipping machine and that while working at this machine, plaintiff would notice an increase in shortness of breath, wheezing and a very rapid heartbeat which had been occurring for three to four years and getting progressively worse. He further learned that this condition would improve when plaintiff was away from work and recur when she returned to work. Dr. Godehn diagnosed an idiosyncratic type allergic reaction as the cause of the nodules on plaintiff's legs, her wheezing, and her asthmatic and cardiac symptoms. He believed her reaction was due to chemicals in the workplace and recommended a job switch to an area where plaintiff would not be exposed to the tipping machine. After the recommended job change, plaintiff's condition cleared and she did not return to Dr. Godehn for treatment until 4 September 1991. At said time, plaintiff was being treated by Dr. Donald W. Russell as a result of her 15 May 1991 symptoms.
7. On her 4 September 1991 visit, Dr. Godehn learned that plaintiff's symptoms returned after the tipping machine was moved back to location near plaintiff at work. She began having episodes of increased heart rate, shortness of breath, asthmatic symptoms and nodules on her legs. On 15 May 1991, plaintiff's symptoms resembled a heart attack and she was referred to Dr. Russell.
8. After consulting with Dr. Russell, and providing further treatment to plaintiff, Dr. Godehn became more convinced that plaintiff's symptoms were due to occupational chemical exposure. He considered plaintiff's exposure to secondary cigarette smoke inside and outside of the work environment. He considered the fact that plaintiff is a non-smoker but her husband smoked and that her husband smoked in the house until October 1991. He also considered plaintiff's exposure to secondary smoke at work. Defendant-employer encouraged people to smoke at work. A sign was posted in the workplace saying "Thank you for smoking."
9. Plaintiff's pattern of experiencing flare-ups with shortness of breath, wheezing and severe nodular lesions when she returned to work, followed by rapid improvement and clearing of symptoms when plaintiff was away from work, occurred again upon her return to work on 30 September 1992 causing her to return to Dr. Godehn on 17 November 1992. Thereafter, plaintiff took a brief leave from work; her symptoms cleared and when she returned to work she experienced a new flare-up within a period of several weeks and again sought treatment with Dr. Godehn on 6 January 1993.
10. Dr. Godehn opined that plaintiff's degree, or amount of exposure to cigarette chemicals and/or cigarette smoke in the workplace triggered her severe allergic reactions. He further opined that plaintiff could not work in the environment at Glatfelter/Ecusta. Dr. Godehn acknowledged that exposure to passive smoke outside of work also caused problems for plaintiff but the severe flare-ups only occurred at work. He concluded that but for the workplace exposure, plaintiff's hypersensitivity vasculitis would not have developed to such an extent as to become disabling. Dr. Godehn's medical opinion was based upon personal examination, testing, consultation with Dr. Russell, review of records of other medical providers, his observation and assessment of the circumstantial evidence of plaintiff's history and the chronology of the pattern of the disease's development. The opinions of Dr. Godehn are accepted as credible.
11. Dr. Russell was equivocal on the issue of causation but he agreed that the work environment at defendant-employer's plant was creating a problem for plaintiff and that she could not work in that environment. He also agreed with Dr. Godehn that hypersensitivity vasculitis, of the type plaintiff experienced, could be caused by dyes, bleaching agents and other chemical absorbed into the blood stream. Likewise, he could not identify any specific chemicals in the workplace that might trigger plaintiff's allergic reaction. He stated that people with asthma, who work in an environment where there are industrial chemicals are at a much higher risk of worsening their condition than the general public and if plaintiff did not have a pre-existing asthmatic condition prior to her employment with defendant-employer, her work environment may have had contributed to the development of her asthma.
12. In his follow-up notes from the 5 May 1993 examination, Dr. Russell concurred with the opinion of Dr. Godehn that plaintiff was sensitive to chemicals in her workplace; however, he was less conclusive during his deposition testimony.
13. In his independent medical evaluation requested by defendant-employer, Dr. T. Reginald Harris opined that although he could not say that plaintiff's occupation caused her hypersensitivity or allergic state, it seems most likely that her work environment aggravated her allergy and caused symptoms and loss of work. He further agreed that plaintiff's symptoms were so severe that she could not continue to work at defendant-employer's plant. Dr. Harris also opined that plaintiff's future employability is severely limited because of her hypersensitivity.
14. According to Dr. Harris, plaintiff's hypersensitivity or allergic state is primarily caused by cigarettes, tobacco, cigarette paper or associated products. This opinion is consistent with that of Dr. Godehn.
15. The defendant-employer had no job available in the plant that plaintiff could do which would not expose her to chemicals used in the manufacture of cigarette paper, cigarette smoke or tobacco products.
16. Although the specific allergens that triggered plaintiff's allergic reaction are unknown, plaintiff's exposure over a period of 19 years to dyes, bleaches and other chemicals used in the manufacturing of cigarette paper in the workplace, and high concentrations of cigarette smoke, tobacco and related products in the workplace either caused or significantly contributed to the development of plaintiff's asthma and hypersensitivity vasculitis; or, aggravated her pre-existing asthma and allergies.
17. Plaintiff's work environment exposed her to bleaching agents, dyes and other chemicals and cigarette smoke in significantly higher concentrations and over more prolonged periods of time than that to which the general public would be exposed. Plaintiff's husband, according to Dr. Donald Russell, would have to have been smoking multiple cigarettes (10 or more at a time) to reasonably expose plaintiff to the degree of cigarette chemicals to which she was likely exposed to in the usual environment at work.
18. Inhalation of passive or secondary smoke due to her husband's smoking did not significantly contribute to plaintiff's disabling asthma and hypersensitivity vasculitis.
19. Plaintiff is unable, as a result of her occupational disease, to earn the same wages that she previously earned in the same employment. Plaintiff is unable as a result of her occupational diseases to work in any environment where she will be exposed in significant amounts, to bleaching agents, dyes, and chemicals used in making cigarette paper, cigarette paper dust and high concentrations of cigarette smoke and tobacco products.
20. Plaintiff's job in the cigarette paper manufacturing industry and the work environment at defendant-employer's workplace exposed her to a greater risk of developing or aggravating a pre-existing asthma condition and for contracting hypersensitivity vasculitis than the public generally and the degree of plaintiff's exposure to inciting or triggering agents from cigarette chemicals was characteristic of and peculiar to her employment.
21. As a result of her occupational disease, plaintiff was temporarily totally disabled from work from 16 May 1991 through 26 August 1992. During a portion of said period, plaintiff received short term disability benefits of $215.00 per week for 26 weeks. Defendants are entitled to a credit for short term disability benefits paid to plaintiff.
22. Plaintiff returned to work on 26 August 1992 and worked until 18 December 1992. At said time, plaintiff was taken out of work due to her disability arising from her occupational disease. Plaintiff had not returned to work at the time of the hearing in this case. Plaintiff received long term disability benefits since 18 December 1992, in the amount of $1,102.00. Defendants are entitled to a credit for long term disability benefits paid to plaintiff.
23. Plaintiff's average weekly wage yields a compensation rate of $346.84.
* * * * * * * * * * * * * * *
Based upon the foregoing findings of fact, the Full Commission ] concludes as follows:
CONCLUSIONS OF LAW
1. As a result of the work assigned by defendant-employer, plaintiff contracted hypersensitivity vasculitis and either contracted or aggravated a pre-existing condition of asthma. Said diseases are occupational diseases within the meaning of N.C. Gen. Stat. § 97-53 (13). Plaintiff's occupational exposure to chemicals used in the manufacture of cigarette paper, dust from cigarette paper, high concentrations of cigarette smoke and tobacco products while working for defendant-employer either caused or significantly contributed to the development of her asthma and hypersensitivity vasculitis; or, significantly aggravated a pre-existing condition of asthma and hypersensitivity vasculitis. Plaintiff's employment exposed her to an increased risk of developing hypersensitivity vasculitis, and an increased risk of developing asthma or aggravating a pre-existing asthmatic condition than the public in general. Plaintiff's asthma and hypersensitivity vasculitis are occupational diseases. N.C. Gen. Stat. § 97-53 (13).
2. During her 19 years of employment, plaintiff was exposed to higher concentrations of cigarette chemicals, dust and smoke over longer periods of time than the general public and said exposure was characteristic of and peculiar to her employment. N.C. Gen. Stat. § 97-53 (13).
3. Plaintiff's occupational exposure was such a significant factor in the development of her occupational disease that without said exposure her occupational disease would not have developed or progressed to the extent that they reached.
4. As a result of her symptoms and condition arising from her occupational disease or diseases, plaintiff was totally incapable of earning wages in any employment from 16 May 1991 through 26 August 1992. Plaintiff returned to work thereafter and worked until 18 December 1992. From 19 December 1992 through the date of hearing, plaintiff remained temporarily totally disabled. Plaintiff is entitled to compensation for her disability arising from her compensable occupational diseases. N.C. Gen. Stat. §97-29.
5. Plaintiff cannot return to her former job with defendant-employer and can only work in an environment that is free of agents that trigger her asthma and hypersensitivity vasculitis symptoms such as cigarettes, tobacco, cigarette paper, cigarette chemicals and related associated products. Defendants have failed to establish that there are other jobs available that plaintiff can do. Plaintiff is entitled to continuing temporary total disability benefits from defendants for so long as her incapacity to earn wages continues. Disability continues until an employee returns to work earning the same or greater wages in the same or any other employment. Radica v. Carolina Mills,113 N.C. App. 440; 439 S.E.2d 185 (1994). N.C. Gen. Stat. § 97-2 (9).
6. Plaintiff is in need of continuing medical care. Plaintiff is entitled to have defendants provide such medical care as may reasonably be necessary to effect a cure, give relief and/or will tend to lessen her period of disability. N.C. Gen. Stat. § 97-25.
7. Defendants are entitled to a credit in the amount of $5,590.00 for short term disability and $1,102.00 in long term disability paid.
* * * * * * * * * * * * * * *
Based on the foregoing finding of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendants shall pay compensation to plaintiff for temporary total disability at the rate of $346.84 per week from 16 May 1991 through 26 August 1992 and from 19 December 1992 through the date of hearing and continuing for so long as plaintiff remains incapable of earning wages or until further Orders of the Industrial Commission. Such compensation as has accrued shall be paid in one lump sum, not to be commuted, subject to an attorney's fee.
2. Defendants shall receive a credit against any compensation due plaintiff in the amount of $6,692.00 for the long term and short term disability paid to plaintiff under an employer funded disability plan.
3. Defendants shall pay all medical expenses incurred or to be incurred in the future by plaintiff when bills for same are submitted to defendant and approved pursuant to procedures established by the Commission for so long as such medical treatment is reasonably required to give relief, effect a cure and/or will tend to lessen the period of disability.
4. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded to plaintiff herein is hereby approved for plaintiff's counsel. Said fee shall be deducted from accrued amounts and paid directly to plaintiff's counsel; thereafter, every fourth check due plaintiff shall be paid directly to plaintiff's counsel.
5. Defendants shall pay the costs due this Commission.
 S/ _________________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ _________________________ DIANNE C. SELLERS COMMISSIONER
S/ _________________________ COY M. VANCE COMMISSIONER